IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| Carolyn Betton, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 4:05CV1455 (JCH) |
| | ) | |
| St. Louis County, Missouri, | ) | |
| | ) | |
| Defendant. | ) | |

**Plaintiffs' Memorandum in Support of Motion for Attorneys' Fees**

**I.    The Missouri Human Rights Act proves for a fee award to the prevailing party**

The Missouri Human Rights Act, RSMo 213.111.2, provides for awards of costs and attorneys' fees to the prevailing party and the statute is "structured to recognize attorneys' fees as a matter of course to prevailing claimants." *Gilliland v. Missouri Athletic Club*, 273 S.W.3d 516, 523 (Mo. banc 2009); *see, Lamb Engineering & Const. Co. v. Nebraska Public Power Dist.*, 103 F.3d 1422, 1434 (8th Cir. 1997)(attorneys fees issue is substantive). Here, four of the five plaintiffs prevailed in their Missouri Human Rights Act claims against St. Louis County. Therefore, plaintiffs are entitled to a fee award.

**II.    Determination of Fee Award**

In determining the fee to be awarded under the Missouri Human Rights Act ("MHRA"), the court considers the following factors: 1) the rates customarily charged by the attorneys involved in the case and by others in the community for similar services; 2) the number of hours reasonably spent on the litigation; 3) the nature and character of services rendered; 4) the degree of professional ability required; 5) the nature and importance of the subject matter; 6) the amount involved or the

1

result obtained; and, 7) the vigor of the opposition. *Gilliland*, 273 S.W.3d at 523 ; *Williams v. Trans State Airlines, Inc.*, 281 S.W.3d 854, 878 (Mo. App. 2009).

### A. Rates customarily charged by the attorneys involved in the case and others in the community for similar services

The four attorneys involved in this motion[1] (hereinafter "Petitioners") customarily charge the rates asked for in their motion. D. Eric Sowers customarily charges $450.00 per hour (Ex. 1, ¶ 5); Ferne P. Wolf customarily charges $400.00 per hour (Ex. 2, ¶ 5); M. Beth Fetterman's time is billed at $250.00 per hour (Ex. 3, ¶ 7); and, Rufus J. Tate, Jr. customarily charges $300.00 per hour (Ex. 4, ¶ 7). Attorneys familiar with the hourly rates charged in this community for the type of work performed in this case confirmed that the rates charged by Ferne P. Wolf and D. Eric Sowers are reasonable and consistent with their level of expertise. Ex. 5, ¶ 7; Ex. 6, ¶ 8.

### B. Number of hours reasonably spent on litigation

Petitioners documented the time they spent on this litigation and explained the nature of their work in their respective declarations (Ex. 1-4). Attached to each of the declarations is a spreadsheet with detailed time records.

Petitioners self-policed their submissions and deleted time spent exclusively on the representation of Cytoys Durham and in meetings with each other, unless those meetings were for the purpose of discussing strategy, planning, and division of work. Other attorneys familiar with this type of litigation reviewed Petitioners' billing records and found the time spent on this case to be reasonable. Ex. 5, ¶ 8; Ex. 6, ¶ 8.

---

[1] Plaintiffs' original attorney, Eric Tolen, filed a separate Affidavit in connection with his claim for attorney's fees. Doc. 122. This Memorandum is not related to Mr. Tolen's separate Affidavit.

Because this case involved the representation of five individuals, combining the prosecution of these five separate cases into one economized certain tasks, such as depositions and written discovery, and therefore renders the time submitted even more reasonable. The number of hours worked, by attorney, are: D. Eric Sowers - 339.9; Ferne P. Wolf - 212.2; M. Beth Fetterman - 37.5; and, Rufus J. Tate, Jr. - 102.7.[2]

### C.  Nature and character of services rendered

This was a difficult case for Petitioners. Petitioners did not represent plaintiffs from the outset of this litigation and therefore had no role in framing the pleadings, developing legal theories, drafting discovery requests, or in making sure the crucial administrative prerequisites to filing statutory civil rights act claims had been satisfied. When Petitioners agreed to handle the case, they faced the following situation: five women who had a Court of Appeals determination that they were entitled to a trial but whose attorney had abandoned them due to his incarceration, coupled with the meager discovery showing defendant disputed the very meeting which plaintiffs claimed was the catalyst for the retaliation. Nonetheless, Petitioners undertook the commitment to represent plaintiffs because of their belief that fellow members of the bar needed to take responsibility for filling the void left by plaintiffs' original counsel, particularly where the Court of Appeals determined plaintiffs had a right to have a jury hear their case. One would hope attorneys knowledgeable in any other field, faced with a similar situation, would do likewise.

In undertaking this commitment, Petitioners were hamstrung by the state of the records they received. Petitioners were experienced enough in trying cases to know they had to ensure they accounted for every piece of paper - document production and discovery pleading - which had been

---

[2]Mr. Tate's records show that he worked more time, but he is not seeking compensation for all hours; Eric Sowers and Ferne Wolf omitted the non-billed entries from their spreadsheets.

exchanged. Defendant provided plaintiffs' counsel with boxes of documents that even defense counsel could not verify had been previously produced in the case; no documents were numbered nor was there any indication as to the source of the documents, or in response to which production request, if any, the documents had been produced. Thus, as explained in Exhibit 2, Petitioners began the process of creating a, leading to Plaintiffs' Request for Admissions. Once that task was accomplished, plaintiffs began to take their first depositions in this case, more than five years after the events occurred.

Because defendant's only sworn statement relating to the all-important June 16, 2004 Muehlheausler meeting was that there was no such meeting, Petitioners had to work to obtain five year old corroborative evidence to convince a jury that the meeting happened, and what was discussed. As late as the time of the filing of its Trial Brief just a few weeks before trial, defendant still refused to admit the meeting took place. *See,* Doc. 71, pp. 1-2 ("Dissatisfied with what they viewed as unequal treatment within the Assessor's Office based on race, on or about June 16, 2004 Plaintiffs *allege* they met and conferred with Philip Muehlheausler, the Assessor (emphasis added)"). It was only at the Final Pre-Trial Conference that defendant admitted the Muehlheausler meeting took place despite Muehlheausler's dogged assertion that he recalled no such meeting.

Against this backdrop of discovery was the rapidly changing law. Plaintiffs alleged violations of both Title VII and the Missouri Human Rights Act. By the time this case was remanded, the interpretation of the Missouri Human Rights Act by the Missouri Supreme Court and the Missouri Courts of Appeals moved in a direction different from previous federal interpretations. Nonetheless, defendant argued to this court in its Trial Brief (Doc. 71, p. 12) that Title VII and the MHRA were to be analyzed "in the same way." Petitioners had to be current in the law to bring the updated

caselaw to the court's attention. Doc. 72, p. 2. Defendant argued plaintiffs were not entitled to punitive damages under the MHRA. Only by being well-versed in caselaw did plaintiffs succeed in having the jury consider punitive damages. Defendant tendered numerous jury instructions to the court at various times; sometimes the instructions were hand-written, done at the spur of the moment. Plaintiffs' counsel had to address these new arguments on the spot; if Petitioners had to research the law for authority, they would not have been able to respond to defendant's proposed instructions.

Additionally, Petitioners were required, in the eleventh hour, to shift their trial strategy and preparation based on developments impossible to foresee, with regard to key witness County Assessor Phil Muehlheausler. In January 2010, defendant moved for a continuance of the trial based on Muehlheausler's claimed illness. Doc. 67. As late as February 9, 2010, when the parties submitted their pretrial reports, defendant still asserted Muehlheausler would not be present at trial due to illness. In its Pretrial Report (Doc. 71, p. 5), defendant listed the Muehlheausler deposition lines it intended to offer pursuant to F.R.Civ.P. 32(a)(4)(C) based on the unavailability of Muehlheausler due to illness. In response, plaintiff moved *in limine* to exclude reference to such illness (Doc. 85) and objected to defendant's proposed deposition lines absent a foundation that Muehleausler was, indeed, too ill to appear at trial (Doc. 82). Petitioners did not rely on defendant's representations regarding Muehlheausler's illness and subpoenaed Muehlheausler. Only during the Final Pretrial Conference and only when plaintiffs prepared to argue their motion *in limine* relating to Muehlheausler's illness did defense counsel disclose that Muehlheausler would appear for trial after all, based on his subpoena (this issue is discussed further in connection with Subpart G, the vigor of defense). Defendant's late disclosure required a significant change in strategy and time

management over the weekend prior to trial - a weekend already packed with other trial preparation.

### D.     Degree of professional ability required

As discussed above in part C, this case required a great deal of knowledge of the nuances of employment law and ability to manage litigation. In addition to being well-versed in the law, Petitioners were representing five distinct individuals, necessitating skill and experience in time management and dealing with client concerns.

### E.     Nature and importance of subject matter

The case at bar is exemplary of the civil rights action involving important principles but small amounts of money. "In human rights cases, the amount of the verdict or judgment may have little bearing on the amount of attorneys' fees," *Gilliland*, 273 S.W.3d at 523, because the "act recognizes the public purpose served by litigation that vindicates the rights of those who are discriminated against." *Id.* Protecting those who exercise their statutory right to complain about discrimination is of paramount concern in the State of Missouri, the legislature having determined the issue so important that "any unfair treatment" based on such a complaint is actionable. RSMo 213.070, 213.010(5).

Working backward from the verdict, the jury clearly decided that defendant held the laws prohibiting retaliation in low regard, and the verdict was a condemnation of defendant's actions. The jury articulated its disapproval of the County's retaliation with significant awards of punitive damages. Hopefully, this judgment will encourage the County to implement and enforce the MHRA prohibition against retaliation and to revisit its framework for enforcing equality in the workplace.

During the trial, the County supervisors testified the only training they received in recognizing and reacting to discrimination issues was limited to being handed a pamphlet during

initial orientation; all of the supervisors appeared to be under the impression that a discrimination complaint, in order to be treated as such, had to be "official," or through the County's grievance policy. The former Director of Revenue appeared at a total loss when it came to race discrimination as opposed to sex discrimination, and claimed no recollection of the plaintiffs having told him – during their group meeting – that they believed they were subjected to "racist" treatment in their department. In this day and age, it is hard to fathom a manager in the private sector hearing the word "racist" in the context of a meeting with five African American employees concerning workplace issues who would not immediately commence an investigation into the complaints of the employees; it is striking that St. Louis County government had such a cavalier attitude towards the issue. Rather than acknowledge and investigate the complaint, Peterson claimed he did not consider the plaintiffs' complaint of racism to be a complaint of race discrimination, defendant denied the June 16, 2004 Muehlheausler meeting occurred in its sworn interrogatory answers, and Muehleausler feigned a lapse of memory.

Eradication of workplace discrimination and protection of those who bring complaints of such discrimination are areas in which government should lead the way both by mandate and example, yet defendant and its managers' reactions were what might be anticipated from the most backward, unsophisticated private sector concern. Bringing this state of affairs to the light of public scrutiny, hopefully compelling reform, is one of the finest roles of the judicial system.

### F.      Amount involved or the results obtained

The amount involved, as discussed above, may have little bearing on cases brought under the Missouri Human Rights Act because of the purpose of the law. *Gilliland,* 273 S.W.3d at 523. The result obtained in this case was that four of the five women who complained about

discrimination in 2004 and suffered unfair treatment because of those complaints had their rights vindicated by a federal jury. Plaintiffs anticipate asking the court for injunctive relief as well in order to eradicate the effects of defendant's conduct. In light of what was at stake monetarily, the result was excellent for these plaintiffs as well as all County employees who might have considered or might in the future consider complaining about discriminatory practices.

### G.     The vigor of the opposition

Throughout Petitioners' involvement in the case, defense counsel vigorously represented the interests of St. Louis County; there was barely a point on which defendant did not oppose Petitioners or lay an obstacle in Petitioners' path.

#### 1.     Documents and written discovery issues

When Petitioners entered their appearance and combed through the available files from the attorney who initiated the litigation, they quickly realized a great number of documents which should have been produced based on written discovery requests were either misplaced or had never been produced. The documents in the attorney's file, apparently produced by defendant, were not numbered or identified as being responsive to a particular Request for Production. Indeed, to this day, Petitioners have never located a written response to Plaintiffs' First Request for Production of Documents to Defendant, served on September 12, 2006.

While defense counsel agreed to make the County's case file available for copying, this production consisted of delivering three boxes containing raw documents to the Sowers & Wolf offices, and leaving them to be copied. Some of the documents in the boxes were clearly defendants' attorney/client communications or attorneys' notes, and Petitioners had to instruct the law clerk working on the copying how to handle such documents, making the project even more arduous.

Petitioners segregated and returned what they believed to be privileged material, consistent with ethical constraints.

Preparation for trial included discovery disputes, one of which mandated a motion to compel before the County would comply with the request.

### 2. **Defendant's denial that the meeting of June 16, 2004 took place and the supervisor comments on the Betton and Johnson evaluations**

Since defendant denied the June 16, 2004 meeting with Muehlheausler actually occurred, and contended, as a matter of fact, that plaintiffs' only complaints of discrimination were in 2002 (when only two of the plaintiffs met with the Assessor, although defendant claimed all of the plaintiffs had), Petitioners had to adduce corroborative evidence so the jury would hear more than a "he-said, they-said" with regard to the meeting. Petitioners found such evidence, *inter alia*, in the telephone policy enforcement announced after the meeting on June 16th, Director Peterson's testimony that the meeting was discussed the next day with him, Peterson's comments about the Assessor's handling of the meeting, and Karen Leahy's notations of Muehlheausler's comments to her about the meeting.

The evidence surrounding the Supervisor's Comments on the Johnson and Betton evaluations is another example of the vigorous defense presented by defendant and the skill required of Petitioners in order to meet that defense so that the jury could reasonably infer that Muehlheauser not only made the false statements regarding plaintiffs' respective "grievances," but also that he had backdated his signature. The presentation of the evidence was not lost on the jury which believed defendant needed to be punished harder in connection with those comments.

### 3. **Attempt to avoid having Muehlheasler testify before the jury**

A few weeks prior to trial, as discussed above, defendant requested a continuance because

of Muehlheausler's claimed medical condition. Defense counsel also represented that Muehlheausler was on FMLA leave and it was their surmise he would retire without returning to work. The court denied defendant's request for a continuance and suggested that Muehlheausler be deposed to preserve testimony. When Mr. Sowers suggested a video deposition, defense counsel discussed logistical issues due to Muehlheausler's medical condition and stated they would contact Muehlheausler and start making arrangements. As time passed with no word from defense counsel regarding such arrangements, Petitioners asked directly about Muehlheausler's deposition approximately a week before pretrial compliance materials were due. Defense counsel responded they had abandoned the idea of a deposition to preserve testimony and, instead, were going to offer Muehlheausler's deposition testimony from the fall of 2009.

About three weeks before trial, defense counsel also agreed to produce all of the witnesses under defendant's control as current employees. Defense counsel specifically exempted Robert Peterson (known to be retired), Mary Blunt (known to be retired), and Phillip Muehlheausler as witnesses defendant was unable to produce, implying that Muehlheusler was, as defense counsel previously believed would be the case, no longer working for defendant and therefore not under defendant's control.

It was not until the Friday before trial, after plaintiffs objected to the use of Muehlheausler's deposition testimony based on illness without evidence supporting that claim, during argument of motions *in limine* and, that defense counsel stated Muehlheusler was expected to testify at trial (based on plaintiffs' subpoena). Even then, it was not until Muehlheusler was on the witness stand testifying as to his current employment that plaintiffs' counsel learned Muehlheausler was as much under control of defense counsel as any of the other defense witnesses. Thus, if Petitioners had taken

defendant's representations about Muehlheausler as gospel and not objected to the use of Muehlheausler's deposition testimony and gone the extra step of serving Muehlheausler with a subpoena, Muehlheausler would not have appeared at trial, even though he was well enough to testify and was still, according to his testimony, the County Assessor.

### 4.    Production of exhibits for trial

As part of its pretrial compliance, defendant produced hundreds of documents in a disorganized manner. Plaintiff objected (Doc. 83) but still had to devote hours to reviewing each piece of paper found in the unnumbered, unstapled Group Exhibits (A-E) which defendant represented were plaintiffs' personnel files (Doc. 71, p. 2). Group Exhibits A-E were not necessarily complete "personnel files;" they included numerous pieces of paper which were clearly hearsay or immaterial to the case; and, they included documents which were duplicates of other documents defendant marked as exhibits. Defendant also produced - with no numbering - a voluminous Group Exhibit QQ, which it labeled "various notes/of observations by various plaintiffs." Finally, in a "Supplemental Exhibit List (Doc. 92)," served after the deadline for filing the exhibit lists, defendant identified 42 new exhibits, photographs which had never before been produced.

### 5.    New witnesses at the last minute

In January 2010, when plaintiffs' attorneys scheduled the deposition of Director Peterson, defense counsel also identified three additional witnesses: the retired Mary Blunt and two supervisors, Mary Losing and Linda Edison, all of whom defense counsel stated defendant intended to call at trial. Defense counsel provided no further information about these new witnesses' proposed testimony and none of these witnesses had been identified by defendant in its Rule 26(a)(1) Disclosures. Without any guidance from which to work, Petitioners had to depose Losing and

Edison in a fishing expedition to learn what, if any purpose, defendant thought their testimony might serve and to then establish topics for cross-examination.

### 6. **Administrative prerequisites**

Defendant refused to stipulate that plaintiffs met the statutory administrative prerequisites to bringing this lawsuit. Since defendant admitted in its Answer that plaintiffs filed their Charges of Discrimination in a timely fashion, that plaintiffs received right-to-sue letters from both the EEOC and MCHR, and that plaintiffs filed this suit within 90 days of receiving those Notices, the fact that defendant refused to stipulate required Petitioners to devote a significant amount of attention to figuring out why defendant would not stipulate and what unwelcome surprise might await them at trial in connection with administrative prerequisites. In the days before trial, after defendant refused to stipulate, Petitioners researched and prepared legal arguments based on scenarios defendant might raise as to the administrative prerequisites.  Additionally, plaintiffs searched for and added to their exhibit list all of the plaintiffs' respective Charges of Discrimination and Notices of Right to Sue. None of this work should have been necessary because at trial, during the testimony of Jurlean Johnson, when plaintiffs attempted to prove they satisfied administrative prerequisites by introducing Ms. Johnson's Charge of Discrimination, defendant objected. At sidebar, defendant finally stipulated the administrative prerequisites had been met.

### 7. **Points of Law**

Defense counsel persistently and creatively argued points of law, from the standard of proof for an MHRA claim, to the availability of punitive damages, to repeated alternative jury instructions with new and different elements. Defendant even re-argued points which had been settled by the 8th Circuit in its decision remanding the case for trial. Defendant submitted and resubmitted jury

instructions with an initial package filed with the pretrial compliance (Doc. 80), additional instructions tendered prior to trial (Doc. 93), a new packet tendered on the first afternoon of trial, and additional instructions tendered during the instruction conferences, including handwritten ones.

### III.  Conclusion

For the reasons stated herein, plaintiffs ask the court to award Petitioners their attorneys' fees in the amounts set forth in Exhibits 1-4.

>s/ Ferne P. Wolf
>Ferne P. Wolf, 4737
>D. Eric Sowers, 5009
>Sowers & Wolf, LLC
>530 Maryville Centre Drive, Suite 460
>St. Louis, Missouri 63141
>314 744-4010/314 744-4026 (fax)
>fw@sowerswolf.com
>
>Rufus J. Tate, Jr., 46993
>7751 Carondelet, Suite 803
>St. Louis, Missouri 63105
>314 726-6495/314 726-0424 (fax)
>tatelawfirm@aol.com

The undersigned certifies that a copy of the foregoing was served on March 25, 2010 on the clerk of the court using the ECF system which will notify the following counsel of record of its filing: Michael A. Shuman and Robert H. Grant, Sr.

>s/Ferne P. Wolf