## Declaration of Ferne P. Wolf

1. I am one of the attorneys of record for the plaintiffs in *Betton v. St. Louis County*, competent to testify about the matters stated herein which are based on my personal knowledge.

2. In May 2009, defense counsel delivered to this office a box of documents, "Box 86279," in connection with this case. Defendant did not appear to have ever served a written response to Plaintiff's First Request for Production (served September 12, 2006, according to the Certificate of Service); in attempting to work out the issue of defendant's response to the Request for Production, defendant delivered Box 86279. Defendant did not deliver these documents for plaintiffs' counsel to keep - only to review and copy. In order to establish a defined group of documents as produced by defendant and therefore be able to establish authenticity at trial, this office then copied each document (except for some which were returned to defense counsel because they appeared to be attorney notes). Some of the documents were double-sided and required two copies per document for the purpose of the numbering which was to follow. We then affixed to each page the Box Number and consecutive numbers, similar to Bates-stamping (e.g., Attachment 1, Defendant's Exhibit NN, produced for trial - the Box number and the page number are circled on the Attachment). The label on the box was given the number "1" and the remaining documents were given the numbers 2 through 1729, consecutively. Plaintiff then scanned and sent defendant a Request for Admissions concerning all of the documents. Attachment 2. All of these copies were necessarily made for this case because plaintiffs' counsel could not know which, if any, of the documents defendant delivered for inspection and copying defendant would use and which of the documents defendant was claiming were responsive to the particular items in the September 2006 Request for Production. Plaintiffs' counsel

EXHIBIT 2

understood they would not have access to the documents once the box was returned to defense counsel. Defendant used the documents produced as a result of this copying project, as well. I have personally reviewed the exhibits defendant delivered to plaintiffs' counsel for use at trial (defendant did not offer all such exhibits into evidence) and found that most (except Group Exhibits A-E and RR - AAA) appear to be the product of the aforementioned copying project, e.g., Exhibit F is Document Number 984; Exhibit G is Document Number 985; Exhibit L is Number 1609, and so forth. Some of the numbered defense exhibits consist of multiple pages from the aforementioned copying project.

3. After the initial delivery described in the preceding paragraph, defense counsel delivered numerous other documents to plaintiff, with the largest group (for copying) consisting of various personnel records. As with the situation described in connection with the documents delivered in May 2009, defense counsel stated he produced the box for our review and he would be picking the box up. Thus, Sowers & Wolf copied the documents and Mr. Shuman, in January 2010, picked up the box. This office did not number the pages as we had done in connection with Box 86279. Mr. Lugo's estimate of the number of copies he had to make from the box is 1,500. *See, Exhibit 4*. Because Mr. Shuman did not leave the documents with us permanently and we did not know which documents defendant intended to use for the trial, we had to copy all of the documents for this case. Just before trial, defense counsel delivered additional boxes of documents; because we were allowed to keep those documents, we did not copy the entire group of documents and would have copied documents from this group only as needed to create exhibits.

4. In addition to the documents described in Paragraphs 2 and 3, this office copied 27 exhibits for trial. We made three copies of each exhibit: one to hand the witness, one for counsel to

use when examining the witness (to place on the courtroom equipment to show the jury), and one for making notes and highlighting so counsel could quickly direct the witness's attention to the relevant portion of the document. The number of pages so copied was 70 pages x 3 = 210, according to Guadalupe Lugo. See, Exhibit 4.

5. The other copying costs encoded to the Betton file, necessary for this case, include: the copying and then cutting and pasting of several of defendant's interrogatory answers in preparation for trial (when trial preparation was being done, counsel did not know whether the court would want and/or allow the jury to be shown the interrogatory answers, so these were cut and paste to omit irrelevant material should the answers have been shown to the jury), with sufficient copies to show opposing counsel; providing plaintiffs a copy of their interrogatory answers for their review; Plaintiff's First Request for Admissions; Plaintiff's Second Request for Production; Plaintiff's Second Interrogatories; copies of correspondence; and, copies of some of the email correspondence between counsel concerning discovery disputes and stipulations.

6. I am not aware of copies made using the Betton copy code which involved documents other than those necessarily used in connection with this case.

7. At my direction, Mr. Lugo spoke with the copying company which services our copier and he was told we could not specify the number of copies per date or the date on which Mr. Lugo assigned the copy code to the case. Exhibit 4.

8. The copying charge on the Bill of Costs is based on the rate of $.20/page.

I declare under penalty of perjury the foregoing is true and correct.

_May 13, 2010_
Date

_Ferne P. Wolf_

Box 86279

June 23, 2004

TO: PERSONNEL

FROM: SHIRLEY SURGENER
        OFFICE SUPERVISOR

RE: GRIEVANCE FILED BY CHARLENE KING PARISH, JURLEAN JOHNSON, CYTOYS DURHAM, COLETTE HOWARD, CAROLYN BETTON

MY RESPONSE TO THE ACCUSATIONS MADE IN THIS GRIEVANCE FILED BY THE ABOVE EMPLOYEES. IT APPEARS TO ME THAT THESE EMPLOYEES ARE WASTING PRODUCTIVE TIME, IF THEY WERE PERFORMING THEIR OWN DUTIES AND BEING PRODUCTIVE EMPLOYEES THEY WOULD NOT HAVE SO MUCH TIME TO BE CONCERN ABOUT WHAT OTHER EMPLOYEES ARE DOING. THE ISSUES LISTED IN THIS GRIEVANCE IS SIMPLY INACCURATE.

**PHONE PRIVILEGES**

    ALL EMPLOYESS WERE ALLOWED TO MAKE BRIEF IMPORTANT CALLS IN THE CONFERENCE ROOM ON THEIR BREAKS AND LUNCH HOUR ONLY. JERI JOHNSON STARTED TO MAKE PERSONAL CALLS DURING WORKING HOURS, SOMETIMES WITHOUT A SUPERVISOR'S PERMISSION. JERI RECEIVED A CALL IN THE CONFERENCE ROOM THIS CALLED FOR ANNETTA STRICKLAND TO LEAVE HER WORKSTATION TO ANSWER THE PHONE CALL, SHE CAME TO ME ONE DAY AND SAID THERE WAS A CALL FOR JERI IN THE CONFERENCE, SHE TRIED TO TAKE A MESSAGE AND FIND OUT HOW THE CALLER GOT THE PHONE NUMBER TO THE CONFERENCE ROOM. THE CALLER WAS VERY RUDE TO HER, I TOOK THE CALL AND INDENTIFIED MYSELF AS THE OFFICE SUPERVISOR AND INFORM THE CALLER THAT IN THE FUTURE ALL CALLS SHOULD COME TO 615-2556, IT WAS JERI'S BROTHER, SO THE ASSESSOR POSTED A NOTE STATING THAT NO CALLS SHOULD BE MADE OR RECEIVED IN THE CONFERENCE ROOM.

    SUSAN BISHOP HAS RECEIVED NUMEROUS CALLS FROM HER BROTHER, WHICH SHE STATED HAS SOME SERIOUS PROBLEMS, WE HAD ASKED HER ON SEVERAL OCCASION TO HAVE HIM NOT CALL SO OFTEN, WHICH SHE DID. BUT HE CONTINUED TO CALL THEN SHE ASKED THAT WE TAKE A MESSAGE AND HE BECAME VERY UPSET THAT SHE WOULD NOT TAKE HIS CALLS AND WOULD TAKE IT OUT ON THE SUPERVISORS THERE WAS NO REASON TO GIVE A MEMO OR TO TAKE AWAY THE PHONE PRIVILEGES FROM OTHER EMPLOYEES SINCE THIS PROBLEM ONLY CONCERN SUSAN AND HER BROTHER.

EXHIBIT NN

1431

Attachment 1

Box 86279

## EMPLOYEES FALLING ASLEEP

THE SUPERVISOR'S NOTICED THAT SUSAN BISHOP HAD A PROBLEM WITH SLEEPING DURING THE DAY, THIS PROBLEM BECAME EXCESSIVE SO WE PUT HER ON AN ACTION PLAN FOR THREE MONTHS TO MONITOR THE PROBLEM. DURING THIS TIME SHE MANAGED TO ELIMINATE THE PROBLEM, SHE HAD COMPLETED THE ACTIION PLAN. DUE TO THE FACT THAT SHE WAS CARING FOR HER MOTHER WHO BECAME VERY ILL AND CARING FOR A BABY WE NOTICE THAT SHE WAS HAVING TROUBLE STAYING AWAKE DURING WORKING HOURS AGAIN. I IMMEDIATELY MONITORED THE SITUATION AND COUNSELED SUSAN THAT SHE NEEDED TO BE AWARE THAT IF IT BECOMES EXCESSIVE AGAIN THAT SHE WOULD BE PUT BACK ON AN ACTION PLAN, I ALSO SUGGEST THAT SHE ELIMINATE THE PROBLEM BECAUSE SLEEPING ON THE JOB WAS NOT ALLOWED.

TODD ZIMMERMAN ALSO HAD A PROBLEM WITH FALLING ASLEEP HE WAS PUT ON AN ACTION PLAN AND MONITORED TO ELIMINATE THE PROBLEM. TODD HAD SEVERAL MEDIACAL PROBLEMS INCLUDING MEDICATION THAT WAS CAUSING HIM TO FALL ASLEEP. ONCE THESE PROBLEMS WERE GONE HE CONTINUED TO FALL TO SLEEP, SUPERVISOR'S AND THE MANAGER WERE GIVEN MANY EXCUSES FROM TODD AS TO WHY THE PROBLEM CONTINUED. TODD HAS RECENTLY BEEN IN CONFERENCE WITH HIS SUPERVISOR AND MANAGER CONCERNING OTHER DISCIPLINARY ACTION IF THE SLEEPING PROBLEM IS NOT ELIMINATED, RECENTLY TODD HAS HAD A FEW INSTANCES OF FALLING ASLEEP.

JEVONS BROWN HAD PROBLEMS FALLING ASLEEP WITHIN THE FIRST THREE MONTHS OF EMPLOYMENT SEVERAL TIMES A DAY. WE HAD SEVERAL MEETINGS WITH HIM ABOUT THIS PROBLEM E AND HE FINALLY STATED THAT IT WAS DUE TO THE FACT THAT HE WAS WORKING TWO FULL TIME JOBS. HE SAID THAT HE WOULD TAKE CARE OF THE PROBLEMS, HE CONTINUED TO FALL TO SLEEP AND HE WAS PUT ON AN ACTION PLAN AND MONITORED, THE PROBLEM WAS CORRECTED, HE WAS PUT IN THE CUSTOMER SERVICED POSITION AT THE CUSTOMER SERVICE COUNTER, WE NOTICE HE STARTED TO FALL ASLEEP OCCASSIONALLY AND HE WAS COUNSELED ON THE MATTER AND THE SLEEPING PROBLEM WAS TAKEN CARE OF.

**SOCIALIZING**

CAROLYN BETTON HAS BEEN COUNSELED ON SEVERAL OCCASIONS ABOUT IDLE TALKING, MEANING THAT BEFORE SHE STARTS HER MORNING SHE MAY GO FROM DESK TO DESK TALKING TO SEVERAL EMPLOYEES. SHE STARTS WORK AT 7:30 THERE ARE TIMES WHEN I GET TO WORK WHICH IS 8:00 SHE HAS NOT START WORK YET. I ADDRESSED THIS WITH HER SUPERVISOR AND CAROLYN 'S SUPERVISOR HAS MONITORED AND TALKED WITH HER ABOUT THIS TALKING TOO MUCH. I HAVE HAD JERI JOHNSON COME TO ME RECENTLY AS THE OFFICE SUPERVISOR WANTING TO KNOW WHAT COULD BE DONE ABOUT HER TALKING, SAID THAT IT REALLY GETS ONS HER NERVES WHEN SHE STARTS TALKING AND

WONT STOP, SOMETIME SHE WILL COME BACK LATER AND CONTINUE TO TALK ABOUT THE SAME THING. DARLENE HAS BEEN ACCUSED OF BEING ALLOWED TO STAND AT JANET SHEETS (SUPERVISOR) DESK BECAUSE SHE WHITE, WELL JERI JOHNSONS WHO IS BLACK HAS DONE THE EXACT SAME THING ON SEVERAL OCCASION.

**OTHER DUTIES AS ASSIGNED**

DURING JERI JOHNSON EMPLOYMENT IN THE ASSESSOR'S OFFICE WHEN THE OPPORTUNITY CAME FOR NEW ASSIGNMENTS AND SPECIAL JOBS SHE MADE EXCUSES TO AVOID BEING TRAINED ON NEW PROJECTS. WE HAVE TRAINED HER TO USE THE IAS SYSTEM EVEN THOUGH SHE WAS RELUCTANT TO DO SO. CYTOYS DURHAM SHOWS VERY LITTLE INTEREST IN INCREASING HER ABILITY TO LEARN OTHER JOB TASKS IN THE DEPARTMENT. SO WHEN NEW EMPLOYEES ARE SELECTED TO LEARN NEW TASKS IT BECOMES AN ISSUE WITH THEM.

TODD ZIMMERMAN WAS NEVER TOLD THAT HE WAS GOING TO BE MOVED TO THE 1ST FLOOR. THE SUPERVISOR AND THE MANAGER CALLED A MEETING WITH HIM CONCERNING HIS SLEEPING PROBLEM. HE STATED TO THE MANAGER THAT HE WAS HAVING PROBLEMS LOOKING AT THE COMPUTER ALL DAY, THIS KEPT HIM FROM PERFORMING HIS DUTIES AND STAYING AWAKE. SHE HAD SUGGESTED TO HIM THAT MAYBE HE SHOULD THINK ABOUT A DIFFERENT AREA OF WORK. THAT'S WHEN HE TOLD HER NO BECAUSE HE LIKE WORKING IN THIS DEPARTMENT. THIS DID NOT CALL FOR ANY DISCIPLINARY ACTIONS TO TAKE PLACE.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| Carolyn Betton, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 4:05CV1455 (JCH) |
| | ) | |
| St. Louis County, Missouri, | ) | |
| | ) | |
| Defendant. | ) | |

## Plaintiffs' First Request for Admissions

Pursuant to F.R.Civ.P. 36, plaintiffs requests that defendant admit the truth of the following matters and the genuineness of the documents as referenced herein.

1. After the remand of this case from the U. S. Court of Appeals for the Eighth Circuit, counsel for defendant provided to plaintiffs' counsel a box containing documents relating to this case.

2. A genuine copy of the label on the lid of the box referred to in Request 1 is attached hereto as Exhibit 1.

3. The label on the lid of the box referred to in Requests 1 and 2 provides the record title is "Bx 86279."

4. After providing Bx 86279 to plaintiff's counsel, counsel for defendant retrieved some of the documents contained in said box.

5. Other than the documents which counsel for defendant retrieved as described in Request 4, genuine copies of all of the documents defendant produced, as described in Requests 1-3, appear on the disk included herewith as Exhibit 2.

Attachment 2

6. The documents appearing on Exhibit 2 consist of documents now numbered consecutively at the bottom of each page with the label "Box 86279" and the numbers 2 through 1729.

_____
Ferne P. Wolf, 4737
Sowers & Wolf, LLC
530 Maryville Centre Drive, Suite 460
St. Louis, Missouri 63141
314 744-4010   314 744-4026 (fax)
fw@sowerswolf.com

_____ (by FPW)
Rufus J. Tate, Jr
7751 Carondelet, Suite 803
St. Louis, MO 63105-3369
314 726-6495
Tatelawfirm@aol.com

The undersigned certifies that a copy of the foregoing, along with Exhibits 1 and 2, was served on the following counsel of record on June 2, 2009, by US Mail, postage prepaid:

Michael A. Shuman
Office of St. Louis County Counselor
41 S. Central
Clayton, MO 63105

_____

| BOX 3 OF 3 | DATE 3/30/09 | | |
|---|---|---|---|
| FORWARD RECORD TO | NAME Mike Shurrn | | TO ROUTE TO RECORDS CENTER |
| | DEPARTMENT / SECTION Counselors | | CHECK THIS BOX ☐ |
| | | TELEPHONE | |
| | DESCRIPTION OF RECORD | | DATE _____ (LEAVE FORM ATTACHED) |
| RECORD TITLE | Bx 86279 | | |
| REQUESTER | | | |
| DATE OF RECORD | | | |
| SPACE NUMBER | 22-6-5-3 | ☐ PERMANENT WITHDRAWAL | |

Form RM25 10/96

Box 86279

1